**McLAREN PERFORMANCE TECHNOLOGIES, INC.,**
Plaintiff,

v.

**DANA CORPORATION, Defendant.**

No. CIV. 98–40318.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 5, 2000.

Kevin H. Breck, Clark Hill, Birmingham, MI, Gerald E. McGlynn, III, Bliss McGlynn, Troy, MI, for plaintiff.

William F. Kolakowski, III, Dykema Gossett, Bloomfield Hills, MI, Joseph P. Lavelle, Howrey & Simon, Washington, DC, for defendant.

## *MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

GADOLA, District Judge.

Before the Court are Defendant Dana Corporation's Renewed Motion for Summary Judgment of Non–Infringement filed August 23, 2000 and Plaintiff McLaren Performance Technologies, Inc.'s Motion for Summary Judgment of Infringement, Validity, and Enforceability filed on August 30, 2000. For reasons stated below, this Court will grant Defendant's motion and deny Plaintiff's motion as moot.

### Factual and Procedural Background

Plaintiff McLaren Performance Technologies, Inc. ("McLaren"), formerly known as McLaren Automotive Group, Inc.,[1] is an automotive technology development company which has its principal place of business in Livonia, Michigan. In January, 1999, McLaren purchased the original Plaintiff in this civil action, ASHA Corporation ("ASHA"), another automotive technology development company with its principal place of business in Santa Barbara, California.

---

1. The Court will modify the caption to show that the proper Plaintiff is McLaren Performance Technologies, Inc. rather than McLaren Automotive Group, Inc., pursuant to the agreement of the parties.

ASHA was the assignee of U.S. Patent No. 5,888,163 (the " '163 Patent"), the patent at issue in this civil action. The '163 Patent, entitled "Hydraulic Coupling for Vehicle Drivetrain," issued on March 30, 1999 to inventors Theodore E. Shaffer and Murat N. Okcuoglu. It appears that the '163 Patent now is owned by McLaren.

Defendant Dana Corporation ("Dana"), is a manufacturer and supplier of axle, transmission, and related components for trucks and automobiles, with its headquarters in Toledo, Ohio. In particular, Dana manufactures a limited slip differential known as the "Hydra–Lok." In general, a differential is a device that permits wheels on the same axle to spin at different rates. A standard differential may impair a vehicle's mobility, however, when one wheel is on a slippery surface, such as ice, while the other is on a non-slippery surface, such as dry pavement. A limited slip differential was invented to transfer power from a wheel that is slipping to the wheel with better traction. (*See* Def. Ex. 6 (Yoshioka Decl.) ¶¶ 11–14; Pl. Br. at 2.)

On September 9, 1998, Plaintiff filed a Complaint in the United States District Court for the Eastern District of Michigan, alleging breach of contract (Count I), unjust enrichment (Count II), and common law fraud (Count III). On September 30, 1998, Defendant filed a motion to dismiss Counts II and III. On October 21, 1998, Plaintiff filed its Amended Complaint, alleging only breach of contract (Count I) and unjust enrichment (Count II); Plaintiff dropped its claim for common law fraud (Count III). On December 10, 1998, pursuant to Defendant's motion, this Court dismissed Count II for failure to state a claim upon which relief can be granted.

On April 6, 1999, Plaintiff filed a Complaint in the United States District Court for the Central District of California, alleging that Defendant's Hydra–Lok infringed the '163 Patent. That civil action was transferred to this Court in July, 1999 (case no. 99–40397) and later consolidated with the original civil action before this

Court (case no. 98–40318) for purposes of discovery and trial.

Therefore, the two claims for relief that remain before this Court are Plaintiff's claims for breach of contract and infringement of the '163 Patent.

On February 11, 2000, Defendant filed a Motion for Summary Judgment of Non–Infringement. On June 26, 2000, this Court denied that motion without prejudice pursuant to its general policy that motions for summary judgment will not be considered until after the close of discovery. *See, e.g., Helwig v. Kelsey–Hayes Co.,* 907 F.Supp. 253, 255 (E.D.Mich.1995). This Court also permitted Defendant to renew its motion following the close of discovery.

Discovery closed on August 4, 2000. On August 23, 2000, Defendant renewed its motion for summary judgment. On September 25, 2000, Plaintiff filed its own motion for summary judgment, in effect agreeing that there are no genuine issues as to material facts but that summary judgment should be granted in its favor. Both of these motions concern only Plaintiff's claim that Defendant's Hydra–Lok device infringed the '163 Patent.

**Discussion**

**1. Standard for summary judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the moving party has the burden of showing conclusively that no genuine issue of material fact exists, and the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party. *See SRI International v. Matsushita Electric Corp.,* 775 F.2d 1107, 1116 (Fed.Cir. 1985).

A fact is "material" for purposes of summary judgment where proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *See Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, where a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *See id.*

Once the moving party carries its initial burden of demonstrating that no genuine issues of material fact is in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. As the United States Supreme Court has stated:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted); *see Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transportation Service, Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### 2. Analysis

Infringement of a U.S. patent occurs when a person or entity, without authority of the patentee, makes, uses, offers to sell or sells the patented invention within the United States, or imports the patented invention into the United States. 35 U.S.C. § 271(a); *see Renishaw v. Marposs Societa' Per Azioni,* 974 F.Supp. 1056, 1081 (E.D.Mich.1997) (Gadola, J.), *aff'd,* 158 F.3d 1243 (Fed.Cir.1998).

Determining patent infringement is a two-step process of (1) claim construction and (2) claim comparison. *See Renishaw,* 974 F.Supp. at 1081. In the first step, the Court must construe the meaning and scope of the disputed claim language. This step is considered to be a question of law, *see, e.g., Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir. 1995), and, therefore, is well suited for summary judgment. In the second step, the Court must compare the properly construed claims with the accused product to determine whether the patent has been infringed either literally or under the doctrine of equivalents. *See Charles Greiner & Co. v. Mari–Med Mfg., Inc.,* 962 F.2d 1031, 1034 (Fed.Cir.1992); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578 (Fed.Cir.1988).

### a. Claim construction

In the claim construction step, the Court must consider three kinds of intrinsic evidence: (1) the patent claims, (2) the patent specification, and (3) the prosecution history, if it is in evidence. *See, e.g., Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996); *Markman,* 52 F.3d at 979.

First, in construing the language of the **patent claims,** the Court must give the words their "ordinary and customary meaning" unless the patentee has given the terms special definitions as "clearly stated in the patent specification or file history." *Vitronics Corp.,* 90 F.3d at 1582.

Second, the **patent specification** is the written description of the invention and "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman,* 52 F.3d at 979; *see Vitronics Corp.,* 90 F.3d at 1582. The patent specification is the single best guide to the meaning of a claim. *Vitronics Corp.,* 90 F.3d at 1582. It is usually dispositive. *Id.* What is patented is not limited to the examples described in the specification, but rather is defined by the words in the claims. *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987 (Fed.Cir.1988). A claim construction should include the preferred embodiment set forth in the patent specification, *see Hoechst Celanese Corp. v. BP Chemicals Ltd.,* 78 F.3d 1575, 1581 (Fed.Cir. 1996), although the preferred embodiment does not necessarily limit the scope of a claim, *see Transmatic, Inc. v. Gulton, Industries, Inc.,* 53 F.3d 1270, 1277 (Fed.Cir. 1995).

Third, the **prosecution history,** if in evidence, "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution," *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir. 1995), but it may not "enlarge, diminish, or vary the limitations in the claim." *Markman,* 52 F.3d at 980 (quotation omitted).

If the meaning and scope of a claim is clear after considering the language of the patent claims, the patent specification, and the prosecution history, then the Court should not consider any extrinsic evidence. *See Vitronics Corp.,* 90 F.3d at 1583. If, however, the meaning and scope of a claim remains unclear, then the Court may consider extrinsic evidence "including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980. Extrinsic evidence is to be used to aid in the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims. *See id.* at 981; *Vitronics,* 90 F.3d at 1583–84.

### i. Patent claims

The parties have not identified a particular claim or claims of the '163 Patent that Defendant is alleged to have infringed. Nevertheless, Defendant asserts that the accused device is lacking one of the elements that is present in each of the claims, namely a "control valve." The '163 Patent claims reads, in relevant part, as follows:

1. A hydraulic coupling for use in a vehicle drivetrain … comprising … *a control valve that is opened and closed to control actuation of the clutch,* said control valve including a main passage and also including a bleed passage through which the pumped hydraulic fluid flows when the control valve is closed, and the bleed passage being cleaned when the control valve is opened.

2. A hydraulic coupling for use in a vehicle drivetrain … coupling comprising … *a control valve that is opened and closed to control actuation of the clutch,* said control valve including a main passage extending through the piston and also including a bleed passage through which the pumped hydraulic fluid flows when the control valve is closed, and the bleed passage being

cleaned when the control valve is opened.

3. A hydraulic coupling for use in a vehicle drivetrain … comprising … *a control valve that is opened and closed to control actuation of the clutch,* said control valve including a main passage and also including a bleed passage through which the pumped hydraulic fluid flows when the control valve is closed, and the bleed passage being cleaned when the control valve is opened.

4. A hydraulic coupling for use in a vehicle drivetrain … comprising … *a control valve that is opened and closed to control actuation of the clutch,* said control valve including a main passage extending through the piston and also including a bleed passage through which the pumped hydraulic fluid flows when the control valve is closed, and the bleed passage being cleaned when the control valve is opened.

5. A hydraulic coupling for use in a vehicle drivetrain differential … comprising … *a control valve that is opened and closed to control actuation of the clutch,* said control valve including a main passage and also including a bleed passage through which the pumped hydraulic fluid flows when the control valve is closed, and the bleed passage being cleaned when the control valve is opened.

6. A hydraulic coupling for use in a vehicle drivetrain differential … comprising … *a control valve that is opened and closed to control actuation of the clutch,* said control valve including a main passage extending through the piston and also including a bleed passage through which the pumped hydraulic fluid flows when the control valve is closed, and the bleed passage being cleaned when the control valve is opened.

('163 Patent, column 14, line 32 to column 16, line 57 (emphasis added).)

▬ In short, at the very least, the '163 Patent claims disclose a control valve (80) that opens and closes such that when the control valve is closed hydraulic fluid flows through the bleed passage (96), and when the control valve is opened the bleed passage is cleaned. Furthermore, the opening and closing of the control valve is what controls the actuation of the clutch. The ordinary and customary meaning of "valve" is some sort of device or mechanism that controls or regulates the flow of fluid, and is something more than a mere hole, port, groove, or channel.

('163 Patent, fig. 10.)

('163 Patent, fig. 11.)

### ii.  Patent specification

The patent specification describes what is disclosed by the '163 Patent claims:

*An object of the present invention is to provide an improved control valve* for use in controlling rotative coupling of a pair of rotary members of a vehicle drivetrain.

In carrying out the above object, *the control valve includes a valve element and a port through which pressurized hydraulic fluid selectively flows* to control the coupling of the pair of rotary members. The port includes a main passage and a bleed passage that is communicated with the main passage. *The valve element of the control valve is mounted for movement between an open position spaced from the main passage of the port and a closed position* where the valve element closes the main passage of the port but permits pressurized hydraulic fluid to bleed through the bleed passage, and the bleed passage upon subsequent movement of the valve element to the open position is cleaned by fluid flow through both passages of the port.

In the *preferred construction,* the control valve has the valve element constructed as an elongated valve element having one portion that is mounted in a spaced relationship to the port and having a distal end that is movable between the open position spaced from the main passage of the port and the closed position that closes the main passage of the port but allows hydraulic fluid to bleed through the bleed passage.  *This elongated valve element is preferably constructed from a bimetallic strip* so as to adjust for temperature changes during use.

*The control valve has a valve body including an elongated mounting recess* having one location at which the one portion of the elongated valve element is mounted and having an end at which the main passage of the port extends through the valve body.  In one construction, the valve body defines the main passage of the port and also defines the bleed passage of the port.  In another construction, the valve body defines the main passage of the port and

the distal end of the valve element defines the bleed passage of the port.

('163 Patent, column 1, line 50 to column 2 line 16.)

Even if the ordinary and customary meaning of "valve" were not sufficiently clear, the patent specification discloses an "improved" control valve (80) composed of a mounted valve element (82) and a valve body that includes an elongated mounting recess (98) and an outlet port (78) which allows pressurized hydraulic fluid to flow through a main passage (94) and a bleed passage (96) as regulated by the opening and closing of the mounted valve element.

('163 Patent, fig. 20.)

('163 Patent, fig. 21.)

('163 Patent, fig. 18.)

The preferred embodiment of the mounted valve element is an elongated bimetallic strip, although, as noted above, this preferred embodiment does not necessarily limit the scope of the patent claims. *See Transmatic, Inc.*, 53 F.3d at 1277.

### iii.   Prosecution history

The limited prosecution history submitted by the parties shows that the initial application for the '163 Patent (Application No. 09/025,486) was rejected on June 26, 1998 because the subject matter claimed in the application was fully disclosed by the applicant's prior patent, U.S. Patent No. 5,735,764 (the " '764 Patent"), and related patents.   In particular, the patent examiner explained as follows:

Claim 27 is rejected under the judicially created doctrine of double patenting over claim 12 of U.S. Patent No. 5,735,764 since the claims, if allowed,

would improperly extend the "right to exclude" already granted in the patent.

The subject matter claimed in the instant application is fully disclosed in the patent and is covered by the patent since the patent and the application are claiming common subject matter, as follows: a hydraulic coupling including a casing, hydraulic pump, a clutch, and a control valve having a bleed passage. (Def. Ex. 12 at 3.) The patent examiner concluded as follows:

> The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. Benjamin ('831) is cited to show valve 10 with bleed passage 50. Filderman ('989) shows a hydraulic coupling have a pump, a clutch, and a control valve. Shaffer et al. ('214) and Shaffer et al. ('764) are patents resulting from parent applications.

(*Id.* at 4.)

For the '163 Patent to have issued, therefore, inventors Shaffer and Okcuoglu had to design around the prior art identified by the patent examiner. A summary of that prior art is as follows: U.S. Patent No. 4,177,831 (the " '831 Patent") discloses a valve for controlling fluid communication through an opening in a wall and allowing communication from one side of the wall to the other but restricting flow in the opposite direction. (*See* Claim 1 of the '831 Patent.) U.S. Patent No. 4,924,989 (the " '989 Patent") discloses a hydraulic coupling with pump, a clutch, and a control valve. (*See* Claims 7 & 8 of the '989 Patent.) U.S. Patent No. 5,595,214 (the " '214 Patent"), which issued to inventors Shaffer and Okcuoglu and was assigned to ASHA Corporation, discloses a control valve with a valve element made from a bimetallic strip, and an outlet port composed of a main passage and a bleed passage that is cleaned when the valve element is opened. (*See* Claim 1 of the '214 Patent.)

Finally, the '764 Patent, which also issued to inventors Shaffer and Okcuoglu and also was assigned to ASHA Corporation, discloses a control valve that includes an elongated valve element made from a bimetallic strip and has an outlet port provided with a main passage and a bleed passage that is cleaned when the valve element is opened. (*See* Claim 1 of the '764 Patent.) In particular, Claim 12 of the '764 Patent, to which the patent examiner explicitly referred, states, in part, as follows:

> A hydraulic coupling for use with a vehicle drivetrain ... comprising ... an inlet port through which hydraulic fluid is pumped into the casing by the hydraulic pump; a clutch including a piston chamber located within the casing and having an actuating piston that is received within the piston chamber ...; the casing including a transfer port through which the pumped hydraulic fluid is fed from the hydraulic pump to the piston chamber; the casing also including an outlet port through which pumped hydraulic fluid flows from the piston chamber; the outlet port including a main passage and a bleed passage; and a control valve including a temperature compensated valve element movable between an open position spaced from the outlet port and a closed position that closes the main passage of the outlet port when the pumped fluid reaches a predetermined pressure ....

(Claim 12 of the '764 Patent.)

While the import of the prior art mentioned in the prosecution history is not entirely clear to the Court—in large part because the parties did not discuss the prosecution history—it does appear that the distinguishing characteristic of the '163 Patent is in the details of the control valve, as stated in the first sentence of the patent specification's "Disclosure of Invention," and not merely in having a control valve.

Because the meaning and scope of the '163 Patent claims are clear in light of the language of the patent claims, the patent specification, and the limited prosecu-

tion history, this Court need not consider any extrinsic evidence. *See Vitronics Corp.*, 90 F.3d at 1583.

### b. Claim comparison

#### i. Literal infringement

■ To establish that Defendant's accused product literally infringes the '163 Patent, every limitation of the patent claims must be found in Defendant's accused product. *See London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir.1991) ("There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device."). The absence of a single limitation of a claim is sufficient to avoid infringement of that claim. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed.Cir. 1991); *Renishaw*, 974 F.Supp. at 1081. Each limitation of the claim must be met by the accused device exactly, any deviation from the claim precludes a finding of literal infringement. *Lantech, Inc. v. Keip Machine Co.*, 32 F.3d 542, 547 (Fed.Cir. 1994). "[A] literal infringement issue is properly decided upon summary judgment when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed.Cir.1998).

In order to determine whether the accused product literally infringes the '163 Patent, the Court must compare the claim construction above with Defendant's accused product, the Hydra–Lok limited slip differential device. Plaintiff asserts that Defendant's Hydra–Lok infringes the '163 Patent because it includes every element of at least one of the patent claims, including a control valve.

■ Defendant asserts that its product does not have a control valve that is opened and closed to control actuation of the clutch. Rather, the piston in Defendant's Hydra–Lok has a simple hole bored through it and a channel from that hole or "port" through which hydraulic fluid may flow unregulated. Indeed, in the Amended Complaint, Plaintiff states that "Dana made an insubstantial change to the valve construction in the piston *by deleting the bimetallic valve element* and using a crude bored passage through the piston in substitution of the bimetallic valve element." (Am. Compl. at 10, ¶ 34 (emphasis added).) This Court does not find such a change insubstantial when it comes to the question of literal infringement. Indeed, Defendant eliminated the valve element entirely from the Hydra–Lok.

Plaintiff now emphasizes that Defendant deleted a *bimetallic* valve element—the preferred embodiment of the mounted valve element—but still retained a control valve as disclosed by the '163 Patent because the patent does not specify that the valve element must be bimetallic. Regardless of the material from which the valve element might be made, however, there is no genuine issue as to the fact that there is no valve element in the relevant portion of Defendant's Hydra–Lok. Rather, there is a hole and a groove—a port with a main passage and a bleed passage, in the terms of the '163 Patent's specification—in the Hydra–Lok piston that remain open at all times to allow hydraulic fluid to bleed into the clutch pack. The mounted valve element, however, is missing.

Therefore, this Court concludes that no reasonable jury could find that every limitation recited in the '163 Patent claims is found in the accused product.

#### ii. Doctrine of equivalents

■ According to the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21, 117 S.Ct. 1040, 137

L.Ed.2d 146 (1997). The doctrine of equivalents is intended to prevent someone from making unimportant and insubstantial changes or substitutions to the patented device. *See Graver Tank and Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 607–09, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558, 564 (Fed.Cir.2000) (en banc). The doctrine of equivalents does not permit the patent claims to be expanded to encompass more than an insubstantial change. *See Graver Tank*, 339 U.S. at 607–09, 70 S.Ct. 854; *Perkin–Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987).

■ The determination of equivalence "must be applied to individual elements of the claim, not to the invention as a whole," *Warner–Jenkinson Co.*, 520 U.S. at 29, 117 S.Ct. 1040, and "should be applied as an objective inquiry on an element-by-element basis," *id.* at 40, 117 S.Ct. 1040. The Court must focus on individual elements with "a special vigilance against allowing the concept of equivalence to eliminate completely any such elements." *Id.* "[A]pplication of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Id.* at 29, 117 S.Ct. 1040. "An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Id.* at 40, 117 S.Ct. 1040. Thus, whatever approach is used for determining equivalence—e.g., the triple identity or the insubstantial differences approach—it must be "probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to *each claimed element* of the patented invention?" *Id.* (emphasis added).

■ Defendant argues that summary judgment should be granted because there is no genuine issue as to a material fact that the valve element of the '163 Patent is missing from the Hydra–Lok. Plaintiff responds by arguing, in effect, that the entire piston itself is a valve element that opens and closes and, therefore, is functionally equivalent to the control valve described in the '163 Patent. This Court finds that Plaintiff's interpretation of the role of the Hydra–Lok piston is too broad an application of the doctrine of equivalents.

First, the Hyrda–Lok piston still is lacking the valve element disclosed in each of the patent claims, so there is nothing to compare element-by-element. As the claims are constructed above, the '163 Patent describes a control valve composed of a mounted valve element and a port through which hydraulic fluid flows. The accused Hydra–Lok product does not have the claimed valve element and, therefore, cannot infringe under the doctrine of equivalents.

Second, even if the requisite elements could be considered present, there is scant evidence that the piston itself moves such that it opens and closes. The only evidence is from one of Plaintiff's expert witnesses who conducted no tests but merely opined that in his experience with similar devices, the Hydra–Lok piston would move approximately 0.002 inches such that the hole or port in the piston opens and closes. (*See* Def. Ex. 20 (Blackmore Dep.) at 57–58.) As Defendant points out, Plaintiff's expert also stated that this feature would be present in any similar device and would not be unique to the Hydra–Lok device or the device described in the '163 Patent (*see id.* at 101), a point that is underscored by this effect not being disclosed in the patent (*see id.* at 66). This mere scintilla of evidence is not sufficient to demonstrate equivalence nor is it enough to withstand summary judgment in Defendant's favor.

## Conclusion

For the reasons set forth above, this Court will grant Defendant's Renewed Motion for Summary Judgment of Non–Infringement. The parties' arguments regarding the validity or invalidity of the '163 Patent, Defendant's argument regarding the "on sale bar," and Plaintiff's argument regarding the enforceability of the '163 Patent are, therefore, irrelevant in light of the lack of any genuine issue of as to a material fact as to Hydra–Lok product not infringing the '163 Patent.

Accordingly, this Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that the caption is **MODIFIED** to replace "McLaren Automotive Group, Inc." with "McLaren Performance Technologies, Inc." as the Plaintiff.

**IT IS FURTHER ORDERED** that Defendant's Renewed Motion for Summary Judgment of Non–Infringement [Docket Entry 185] is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment of Infringement, Validity, and Enforceability [Docket Entry 196] is **DENIED** as moot.

**SO ORDERED.**