United States Court of Appeals,

Eleventh Circuit.

No. 95-4636.

BERNARD SCHONINGER SHOPPING CENTERS, LTD., a successor to Schoninger Management Corporation, Plaintiff-Appellant,

v.

J.P.S. ELASTOMERICS, CORP., successor to J.P. Stevens & Co., Inc., Defendant-Appellee.

Jan. 6, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-739-CIV-EBD), Edward B. Davis, Judge.

Before TJOFLAT, Circuit Judge, and RONEY and PHILLIPS[*], Senior Circuit Judges.

TJOFLAT, Circuit Judge:

The controversy in this diversity suit stems from a leaky roof. The owner of the porous building seeks money damages against the installer of the roof under several legal theories. The district court held the owner's claims barred on the ground that the applicable statute of limitations had run. The district court entered summary judgment for the installer, and the owner appeals. We affirm.

I.

Bernard Schoninger Shopping Centers, Ltd., the appellant, is a limited partnership organized under the laws of Florida.[1] Schoninger owns and manages ten shopping centers, one of which

[*]Honorable J. Dickson Phillips, Jr., Senior U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

[1]Schoninger's predecessor, Schoninger Management Corporation, Inc., was the owner of the subject building at the time the roof was installed. We refer to both the corporation and the limited partnership hereinafter as "Schoninger."

includes a Kmart located in Bradenton, Florida. In July 1984, Schoninger decided to refurbish the roof of the Kmart building, a roof with an area greater than 100,000 square feet. Schoninger sought bids for the project and chose J.P. Stevens & Company, Inc., the predecessor of the appellee, J.P.S. Elastomerics, Inc.[2] JPS is a Delaware corporation which manufactures and sells roofing products, including a synthetic material called "Hipalon Hi-Tuff Membrane" (the "membrane"). When unrolled, attached, and sealed to an existing roof, the membrane resembles a large plastic sheet that repels water from the roof. In this case, the membrane covers the original Kmart roof, which was not removed. The original roof consists of a one-half-inch, gypsumboard deck with tar and gravel on top and fiberglass insulation underneath.

The employees of JPS themselves do not install the membrane. Instead, JPS maintains standard agreements with various subcontractors, or "applicators," to install the membrane. From a list of these authorized applicators, Schoninger chose General Roofing Industries, Inc. ("GRI") to attach the membrane to the Kmart roof. GRI then contracted with Schoninger to do the work.[3] GRI used an installation manual supplied by JPS to purchase the supplies required to complete the project. These supplies included

---

[2] J.P. Stevens & Company, Inc. and J.P.S. Elastomerics, Inc. are referred to hereinafter as "JPS."

[3] 3 As we indicate in the text *infra,* the record does not contain these parties' agreements with one another. Apparently, their agreements were oral. The parties appear to have exchanged correspondence in reaching their agreements, but such correspondence is not in the record. All that is in the record is the written warranty JPS issued to Schoninger on September 18, 1984.

an unspecified amount of JPS' membrane, a large quantity of one-half-inch-thick wood fiberboard to be placed under the membrane, and several thousand "toggle bolts" to secure the membrane and fiberboard to the Kmart roof.[4]

In early September 1984, GRI notified JPS that GRI had completed its work on the Kmart roof. On September 7, 1984, an employee of JPS, Paul Dillenbeck, met with an employee of GRI, Dan Caldwell, and an employee of Olympic Manufacturing Group, Inc.,[5] Stan Choiniere, to inspect the completed work. In a report dated the same day, Choiniere described defects in the installation of the toggle bolts. Schoninger did not receive a copy of Choiniere's report, but JPS and GRI apparently did.

Dillenbeck also filed an inspection report, dated September 8, 1984 ("Dillenbeck's first report"), which characterized GRI's work as entirely good. Despite corporate policy to the contrary, JPS sent a copy of Dillenbeck's first report to Schoninger. In a separate report dated September 10, 1984 ("Dillenbeck's second report"), however, Dillenbeck listed five defects in the work done on the Kmart roof. Attached to Dillenbeck's second report was a "punch list" of flaws that required the attention of GRI; the punch list bears the signature of GRI's Dan Caldwell. Schoninger never received Dillenbeck's second report. Although the Choiniere report and Dillenbeck's second report catalogued several deficiencies in the Kmart roof, Dillenbeck's superiors at JPS

---

[4]A toggle bolt is a long metal bolt with a "V"-shaped, spring-loaded catch at one end.

[5]Olympic Manufacturing Group, Inc. made the toggle bolts used to re-roof the Kmart building.

nevertheless issued to Schoninger a ten-year, written warranty for the roof, effective September 18, 1984.[6]

On September 29, 1984, the tenant of the Kmart building reported leaks in the newly completed roof. Schoninger contacted GRI, which performed repairs. The leaks persisted, however, and the warranty department of JPS became involved in coordinating the repair efforts. The roof continued to leak. On August 5, 1988, JPS terminated GRI as the subcontractor responsible for repairing the Kmart roof. JPS reassigned the task to National Skyway Roofing, Inc. Shortly thereafter, however, JPS terminated National Skyway and reassigned the work to Atlantic Roofing, Inc., which continued to attempt to repair the Kmart roof. The roof never stopped leaking. In September 1991, JPS informed Schoninger that, due to water damage, at least one portion of the original roof would require replacement.

Schoninger filed this complaint on March 18, 1993, in the Circuit Court of Dade County, Florida. The complaint alleged seven claims, including the following: fraud, negligent misrepresentation, breach of express warranty, breach of implied warranty of fitness for particular purpose, breach of implied warranty of merchantability, and negligence in the design,

---

[6]The written warranty provides as follows:

> "[JPS] warrants to [Schoninger] ... that subject to the terms, conditions, and limitations stated herein, [JPS] will repair any leaks in the Hi-Tuff Roofing System ("Roofing System'), but not to exceed [Schoninger's] original cost of the installed roof over the life of this Warranty, installed by a[JPS] Authorized Roofing Applicator for a period of -TEN- years commencing with the date of the final inspection and acceptance of the Roofing System installation by [JPS]...."

manufacture, and installation of the roofing system.[7]  On April 20, 1993, JPS removed the case to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1441 (1994).[8]

After more than eighteen months of discovery, JPS moved for summary judgment, contending that Schoninger's claims were barred by Fla. Stat. ch. 95.11(3)(c) (1995).[9]  On April 13, 1995, the district court granted the motion, holding that Schoninger's claims were time-barred.  This appeal followed.

## II.

Our review of a district court's grant of summary judgment is *de novo.*  *Duke v. Massey,* 87 F.3d 1226, 1230 (11th Cir.1996).  We

---

[7]For reasons that are not apparent from the record or the briefs on appeal, Schoninger did not allege a claim based on the ten-year, written warranty that JPS had given to Schoninger on September 18, 1984.

[8]The district court had removal jurisdiction:  Schoninger and JPS are citizens of different states, and the amount in controversy—although never authoritatively calculated by the parties—clearly exceeds $50,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a)(1) (1995).  Based on his experience with similar roofs, the consultant hired by the plaintiff roughly estimated the replacement cost of the damaged portion of the Kmart roof to be $245,000.  We have no reason to doubt the validity of this approximation.

[9]Simultaneously, Schoninger moved the district court for leave to amend its complaint for the purpose of adding allegations of fact to its claim of fraud.  The district court denied Schoninger's motion.

In this appeal, Schoninger contends that the court abused its discretion;  it asks that we remand the case for further proceedings on its fraud claim.  We find no abuse of discretion.  Schoninger's motion came late in the case—twelve days before the discovery cut-off date and one month before the parties' pretrial stipulation was to be filed.  The additional factual allegations Schoninger presented would not have saved Schoninger's fraud claim from dismissal on summary judgment.

view in the light most favorable to the plaintiff the evidence bearing on the issue of when its cause of action arose. We give the plaintiff the benefit of all reasonable inferences on this point. Florida law determines when the applicable statute of limitations began to run in this case, but federal law determines whether the evidence supporting this starting date suffices to entitle the defendant to summary judgment. *See Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir.1993).

### III.

### A.

Schoninger argues that the district court erred in applying the four-year statute of limitations contained in Fla. Stat. ch. 95.11(3)(c) to each of Schoninger's claims. This provision applies to "[a]n action founded on the design, planning, or construction of an improvement to real property." Fla. Stat. ch. 95.11(3)(c) (1995). Schoninger contends that the installation of the membrane on the Kmart roof was not an "improvement to real property." We reject this argument.

Although chapter 95 does not define an "improvement," the Florida Supreme Court has defined it as "[a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement of waste, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes." *Hillsboro Island House Condominium Apartments, Inc. v. Town of Hillsboro Beach,* 263 So.2d 209, 213 (Fla.1972) (quoting Black's Law Dictionary 890 (4th ed.1969) (internal quotes omitted)). According

to Schoninger, the "replacement" of the entire Kmart roof was a "mere repair." The record does not support this contention.

Schoninger did not hire JPS because the Kmart roof needed immediate repair; Schoninger hired JPS to attach to the Kmart building an entirely new, ostensibly durable covering. Howard Schoninger stated as much when he identified his reason for hiring JPS: "I knew I would need a roof eventually." The installation of over 100,000 square feet of membrane and fiberboard at a cost of tens of thousands of dollars is a "valuable addition" to the Kmart building, and it therefore qualifies as an "improvement." *See Pinnacle Port Community Ass'n, Inc. v. Orenstein,* 952 F.2d 375, 378 (11th Cir.1992).

In addition, Fla. Stat. ch. 95.11(3)(c) applies to " "any' action arising out of improvements to real property, *whether founded on contract or on negligence.*" *Dubin v. Dow Corning Corp.,* 478 So.2d 71, 72 (Fla. 2nd Dist.Ct.App.1985) (emphasis added). Schoninger's claims for negligent misrepresentation, breach of express and implied warranties, and negligence in the design, manufacture, and installation of the membrane are obviously based on contract or negligence. Therefore, Fla. Stat. ch. 95.11(3)(c) clearly applies to all of Schoninger's claims except its fraud claim.[10]

---

[10]Schoninger contends that, when Schoninger and JPS originally contracted to refurbish the Kmart roof, JPS represented that the finished roof would not leak for at least ten years while knowing that this representation was false. Schoninger claims that it relied on this misrepresentation and purchased a defective roof. This claim fails because the record contains no evidence that would permit a trier of fact to find that, at the time JPS and Schoninger agreed to the roofing project, JPS knowingly misrepresented a material fact.

As for the latter claim, Schoninger contends that the district court should have applied the time limit for fraud, Fla. Stat. ch. 95.11(3)(j),[11] the operation of which is described in Fla. Stat. ch. 95.031(2).[12] Schoninger asserts in its brief that, unlike the provision applied by the district court, the fraud provision starts the limitations period only when the plaintiff discovers the "*facts* constituting the fraud." We find, however, little difference between this language and that of Fla. Stat. ch. 95.11(3)(c): "when the action involves a latent defect, the time runs from the time the defect is discovered or should have been discovered with the exercise of due diligence." Fla. Stat. ch. 95.11(3)(c) (1995). Both statutes start running when the plaintiff discovers the defendant's error. Even if we could glean some semantic distinction from the two provisions, both statutes provide

---

However, Schoninger's brief implies, but does not assert, that the evidence established another, distinct fraud claim. This claim can be articulated as follows: when GRI finished the project, JPS inspected GRI's work and discovered that it was defective. Nonetheless, JPS advised Schoninger through Dillenbeck's first report that the work had been done properly and that the roof would not leak. Relying on this representation, Schoninger accepted JPS's ten-year written warranty and, in exchange, gave up its common law causes of action against JPS. We shall assume, for purposes of this appeal, that Schoninger's complaint has been amended to incorporate this theory of recovery and that the record supports this allegation.

[11]Fla. Stat. ch. 95.11(3)(j) provides a four-year statute of limitations for "[a] legal or equitable action founded on fraud." Fla. Stat. ch. 95.11(3)(j) (1995).

[12]Fla. Stat. ch. 95.031(2) states that "[a]ctions for ... fraud under s. 95.11(3) must be begun within the period prescribed in this chapter, with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." Fla. Stat. ch. 95.031(2) (1995).

a four-year limitations period, rendering the distinction at best academic. We therefore decline to reverse the district court's application of Fla. Stat. ch. 95.11(3)(c) to Schoninger's implied fraud claim.

B.

Having determined that Fla. Stat. ch. 95.11(3)(c) applies to all of Schoninger's claims, we must decide when the statute began to run. Schoninger argues that the district court erred in holding as a matter of law that the statute began to run before March 18, 1989.[13] As noted *supra,* the limitations period contained in Fla. Stat. ch. 95.11(3)(c) starts running "from the time the defect is discovered or should have been discovered with the exercise of due diligence." Fla. Stat. ch. 95.11(3)(c) (1995). Under Schoninger's approach, it could not have learned of JPS' misconduct until JPS told Schoninger that the Kmart roof needed major repairs. Schoninger therefore asserts that Fla. Stat. ch. 95.11(3)(c) did not begin running until September 19, 1991, the date on which JPS informed Schoninger of the state of the Kmart roof.

Schoninger analogizes this case to *Board of Trustees v. Caudill Rowlett Scott, Inc.,* 461 So.2d 239 (Fla. 1st Dist.Ct.App.1984), *appeal denied,* 472 So.2d 1180 (Fla.1985). In *Caudill,* a community college sued the contractors that built several campus buildings. The first buildings were completed approximately nine years before the litigation commenced. The

---

[13]Schoninger filed its complaint on March 18, 1993. Therefore, the four-year statute of limitations contained in Fla. Stat. ch. 95.11(3)(c) must have started running *after* March 18, 1989 for Schoninger's complaint to have been timely filed.

underground pipes installed by the defendants started leaking shortly thereafter, and the defendants attempted several unsuccessful repairs. Eight years after the completion of the buildings, the college conducted an extensive survey and discovered that the leaks were caused by improper installation of the pipes. The trial court found that the first leaks had started the running of Fla. Stat. ch. 95.11(3)(c), but the Florida District Court of Appeal reversed. The appellate court held that a genuine issue existed "whether the college had discovered, or by diligence should have discovered, the corroded pipes which are the basis of its cause of action." *Caudill* at 243. Based on this case, Schoninger claims that a genuine issue of fact remains regarding when Fla. Stat. ch. 95.11(3)(c) began to run here. We disagree.

The court itself in *Caudill* distinguished leaky pipe cases from leaky roof cases: " "roof leaks' which occur as soon as the roof is finished indicate that either the architect, the roofing contractor, or the material supplier is at fault; ... defects in underground water pipes are not as easily detectable as defects in a roof, which become apparent after every rainstorm." *Caudill* at 244. Kmart reported multiple leaks to Schoninger on September 29, 1984, shortly after the construction was completed. Between this date and March 18, 1989, Schoninger's records indicate Kmart complained of approximately fifty leaks. New roofs do not leak; they do not require a period to "settle" before they become watertight. We hold that the first reported series of leaks started the statute of limitations running. *See Dubin v. Dow Corning Corp.,* 478 So.2d 71, 73 (Fla. 2nd Dist.Ct.App.1985) (citing

Kelley v. School Bd. of Seminole County, 435 So.2d 804, 806 (Fla.1983)). Schoninger cannot rely on a lack of knowledge of the specific cause of the defects in the Kmart roof to protect it from the running of Fla. Stat. ch. 95.11(3)(c). *See Almand Constr. Co. v. Evans,* 547 So.2d 626, 628 (Fla.1989).

Even assuming *arguendo* that the statute started running only when Schoninger could attribute the leaks to improper installation, Schoninger had such knowledge on August 28, 1986, more than six years before Schoninger filed its complaint. On that day, Howard Schoninger sent a letter to JPS in which he quoted a report he received from the tenant of the Kmart building:

> "[T]he probable source of the leaks is water running under the improperly secured flashings that were installed by General Roofing, Inc., along with J.P. Stevens Roof. The items do not appear to be properly secured or sealed to prevent water seeping under them. The toggle-bolt fasting devices that are used to secure the recovery board and single ply membrane for the J.P. Stevens roof, appear to be improperly secured...."

This quote demonstrates conclusively that Schoninger was on notice of its remaining causes of action long before March 18, 1989. We hold that, as a matter of Florida law, Fla. Stat. ch. 95.11(3)(c), the applicable statute of limitations, began to run on September 29, 1984. As a matter of federal law, we hold that the weight of the evidence supporting this starting date entitles JPS to summary judgment pursuant to Fed.R.Civ.P. 56(c).

AFFIRMED.